## UNITED STATES et al. v. BERGER et al.

No. A–3132.

District Court, Alaska, Third Div.
Anchorage.

June 28, 1946.

For former opinion, see 10 Alaska 570.

Noel K. Wennblom, U. S. Atty., of Anchorage, for plaintiffs.

W. N. Cuddy, of Anchorage, for defendants.

DIMOND, District Judge.

Trial on the merits was had, and at the conclusion thereof the Court granted motion of plaintiffs for an instructed verdict. That verdict finds that plaintiffs are entitled to recover from defendants $5,570.67 with interest thereon at the rate of 6% per annum from January 6, 1940. Motion for new trial has been argued and submitted.

This is an action on an injunction bond given by the defendants, Berger, as principal, and Wells, Irvin and McDonald, as sureties, in a suit (No. A-1053) hereinafter referred to as the first suit, brought in this Court in 1938, in which Berger was plaintiff, and Ohlson and Cunningham, individually and as general manager and acting general manager, respectively, of the Alaska Railroad, named as plaintiffs herein, were defendants. The body of the bond reads as follows:

"Whereas, the plaintiff above-named has commenced a suit in the above-entitled Court against the defendants above-named and has made application to the Court for a temporary injunction against the said defendants, enjoining them and restraining them from the commission of certain acts, particularly set forth and described in the complaint on file in said suit, and the Court having, on the 3rd day of June, 1938, issued the temporary injunction prayed for in said complaint on condition that the plaintiff post a good and sufficient undertaking in the amount of $7,500.00, to be approved by the Clerk of the District Court;

"Now therefore, we, the undersigned, residents and householders in the City of Anchorage, Alaska, in consideration of the issuance of said temporary injunction, do hereby, jointly and severally undertake, in the sum of Seventy-five hundred Dollars ($7,500.00), and promise to the effect that the said plaintiff will pay to the parties enjoined in such damages, not exceeding the amount of this undertaking, as such parties may sustain by reason of the said temporary injunction, if the Court finally decides that the plaintiff was not entitled thereto."

The bond was furnished to make effective the temporary injunction granted by the Court, and that injunction restrained and enjoined Ohlson and Cunningham from interfering with Berger's use of the City Dock, the roadway leading thereto, Berger's lighterage operations over said dock, and, in an all inclusive command, "from the acts complained of in the plaintiff's complaint herein."

So we are forced to look at the complaint, in which we find Berger asserting that Ohlson and Cunningham "demanded * * * wharfage for cargo coming *over the said City Dock and the ground adjacent thereto.*" (Emphasis supplied.)

Thereafter, this Court, in its final decision, (findings of fact and conclusions of law) held that the defendants Ohlson and Cunningham in that cause, had the right,

as representing the United States Government, "to charge the equivalent of wharfage for use of uplands owned by the United States," and "That the plaintiff had and has no right to use the roadway over the Alaska Railroad Terminal Reserve leading from the wharf in question to the Alaska Railroad right of way," and, further, "That the preliminary injunction * * * be dissolved" and the prayed for "permanent injunction * * * be refused."

Berger appealed from the judgment of this Court to the United States Circuit Court of Appeals for the Ninth Circuit, which affirmed the judgment of the District Court and held that the United States had the right to forbid the use of the City Dock by Berger.

The decision of the District Court, thus affirmed by the Circuit Court of Appeals, dissolving the injunction was in legal effect, a decision that all of the signers of the bond, namely, all of the defendants in this action, had become liable on the bond. Thereupon, this current action was brought and the plaintiffs now seek to recover from the defendants the sum above mentioned.

The only matters in dispute in this case are stated in Paragraphs XIII, XX and XXII of plaintiffs' complaint wherein it is alleged that on May 25, 1938, Cunningham had demanded of Berger wharfage charges on cargo "then moving over said 'City Dock' and the grounds adjacent thereto * * * at the rates published by the Interstate Commerce Commission, effective at that time for docks and wharves of the Alaska Railroad at Anchorage, Alaska;" that between June 22, 1938 and May 6, 1940, "Berger landed and moved cargo on and across said 'City Dock' and the lands adjacent thereto, all being within said 'Alaska Railroad Terminal Reserve' and without paying wharfage thereon" and subject to wharfage charges in the total sum of $5,627.02; and that such charges are unpaid.

The granting of motion for instructed verdict was deemed necessary to conform with the views of the Circuit Court of Appeals for the Ninth Circuit expressed in its opinion in the first suit (120 F.2d 56),

and by the same Court on the former appeal of the instant case by the government from an order of dismissal (9 Cir., 150 F. 2d 56), and the logical conclusions to be drawn from those views. That such action is entirely in harmony with the former decision of this Court in the first suit, is amply indicated by the above quotations from that decision.

The genesis of this action may best be shown by quoting from the opinion of the Circuit Court of Appeals in the first suit (9 Cir., 120 F.2d 56, 57, 58) as follows:

"This is a suit by appellant against appellees to enjoin them from preventing him from discharging cargo over the 'City Dock' near Anchorage, Alaska, and hauling it to the city over a roadway across land owned by the government, without the payment of wharfage fees claimed by appellees, O. F. Ohlson, general manager, and J. T. Cunningham, as acting general manager, of the government owned and operated Alaska Railroad. This dock is located on the south side of Ship Creek, a small tidal stream which empties into Knik Arm at the head of Cook Inlet, which connects with the Gulf of Alaska.

"Appellant is engaged in transporting goods by water from Seattle to Anchorage. For some time he has been using small boats (carrying 70 to 118 tons) discharging over the 'City Dock', but recently has undertaken to use larger boats (carrying 1,000 tons) lightering the cargo to the City Dock.

"The defendants have not objected to the use of the City Dock for discharging small boats but in using larger boats and lightering cargo to the City Dock appellant seriously competes with the Alaska Railroad, which is also engaged in transporting goods from Seattle to Anchorage. The Railroad's service between these cities is maintained through its connection with water transportation at Seward. Goods are brought from Seattle to Seward by water and carried from Seward to Anchorage by rail. To overcome this competition appellees demanded wharfage from plaintiff for the use of the City Dock according to the rates fixed for the use of the Railroad docks at Anchorage.

"In May, 1938, while appellant was engaged in landing a cargo of building materials at the City Dock, the roadway from the dock to Anchorage, for which these materials were destined, was blocked by appellees by placing coal cars on the railroad tracks across the roadway to enforce payment of the wharfage fees prescribed by the railroad's terminal tariff applicable to the wharves of the railroad at Anchorage. Appellant thereupon obtained a temporary injunction against the roadway obstruction. Appellees thereupon placed special agents on the City Dock who prevented the removal of appellant's cargo then on the dock until he paid, under protest, the wharfage fees demanded. Informed by appellees that similar charges would be exacted on future shipments unloaded at the City Dock from large boats, appellant brought the present action to restrain appellees fom interfering with his use of the City Dock and from obstructing the roadway to Anchorage. After hearing the court entered its decree dissolving the temporary injunction and refusing a permanent injunction. From that decree this appeal has been taken."

In the original case the principal, if not the whole, issue revolved around the ownership and use of the structure known as the City Dock and the status of the government reserved lands, called the Alaska Railroad Terminal Reserve, which had been so placed in reserve for railroad purposes by executive order of the President pursuant to authorizing Act of Congress.

The land involved here is a special reservation made for a special and useful purpose, and not ordinary public domain of which use by settlers has been permitted by the government since the earliest days of the nation, and which, as to vast areas of agricultural and mineral lands, might pass, by law, into the ownership of such settlers. This land was withdrawn from entry for railroad purposes in connection with the construction and operation of a railroad wherein the taxpayers of the United States have invested more than 70 millions of dollars. By the making of such reservation the government of the United States indicated its intent to pre-

vent all use of the land by private persons except such as might be permitted by the government for purposes not inconsistent with the objects and purposes of the government in making the reservation.

The Circuit Court of Appeals found that all of the City Dock was on the Reserve lands and that although the City Dock was built by the City of Anchorage without interference from the United States Government or any agency thereof, at best "the public of the City of Anchorage had a mere license to use the City Dock, and that the United States had a right to terminate the use of the dock and that the defendants did so." 120 F.2d at page 60, 2d col. And so, although the judgment of the District Court was based upon the theory that the plaintiff had a right to use the City Dock but that the Alaska Railroad officials acted within their rights in excluding the plaintiff from the roadway leading thereto unless an amount equivalent to the wharfage was paid, the Circuit Court of Appeals said:

"We find it unnecessary to pass upon the right of the appellant or of the public to use the roadway leading to the City Dock because the record clearly shows that the real controversy between the parties is to the use of the City Dock and defendants' interference with the use of the road was incidental to the assertion of that right. The defendants' objection was to the hauling of cargo from large competitor vessels over the road where it had passed over the dock without paying wharfage fees. Whether the defendants could rightly condition their consent to the use of the City Dock and Roadway upon the payment of an amount equivalent to the wharfage charged at the docks of the Alaska Railroad is not passed upon by us. The court was asked to enjoin any interference with the use of the City Dock and Roadway by the plaintiff. As the defendants had a right to forbid any use of the City Dock by the plaintiff it could not enjoin them from so doing." 120 F.2d at page 60, 2d col.

It is evident that the District Court gave judgment against Berger on one ground and the Circuit Court of Appeals sustained

that judgment on another ground, both necessarily to the effect that Berger was not entitled to an injunction as prayed for against Ohlson and Cunningham, individually or as officers of the Alaska Railroad.

While it was tolerably plain in the first suit, when the proof was all in, that Berger was not entitled to the injunction, and doubtless no injunction would have been granted if the Court could have heard all of the testimony in the first instance, nevertheless the injunction was granted and remained in force for some considerable time, and during that period Berger carried ashore from a ship or ships the cargo upon which he is now asked to pay the equivalent of wharfage charges.

■ Under such circumstances, it would be unjust to impose upon Berger at this time charges essentially unreasonable or which he had no right to anticipate for landing of the cargo over government structures or ground. But no such attempt is made here. The wharfage charges sought to be collected are the standard charges prescribed for all railroad docks at Anchorage and Berger knew definitely and positively in advance that he would be expected to pay such charges if he brought his cargo ashore over the structures or lands of the Reserve. It can hardly be claimed that the charges are unreasonable, and if any claim of unreasonableness is made—and no such claim has been made in this case—then the burden should be upon Berger, or the other defendants, or all of them, to show that the charges are unreasonable. It was and is the duty of the government officials to protect the rights and interests of the government in the operation of the Alaska Railroad with respect to competition as well as in all other respects and, therefore, when Berger chose to use government property in the bringing ashore of his cargo in competition with the Alaska Railroad, he cannot be heard to complain because he is compelled to pay reasonable charges imposed for the use of the facilities, or the Reserve lands, of the United States Government. Moreover, Berger was warned in advance that the charges would be collected if the government could collect them.

■ During the trial of the instant case and on the motion for a new trial it was insistently urged that, no matter what the status of the City Dock may have been, or may be at the present time, the wharfage rates then demanded by the Alaska Railroad for moving cargo over the City Dock did not apply and were not intended to apply to any cargo that was brought in over the uplands along the beach on the Alaska Railroad Terminal Reserve near the City Dock or adjacent to it, because the wharfage rates or schedules set up and maintained by the general manager applied only to "freight moving by water handled over Docks or Wharves at Anchorage, Alaska" (Plf. Ex. 1), that is to say, only the supplies brought ashore over a wharf—over a structure of some kind that may be called a wharf—and not to supplies brought ashore over an open beach. It is pointed out that the schedule of wharfage rates or charges found in Tariff No. 34–B (Plf. Ex. 1) mentions docks or wharves only, and has no reference whatever to the use of the other shorelands within the Reserve, and that it was not until several years later that the tariff schedules were so changed as to impose the wharfage charges for the use of cargo brought ashore over such other shorelands of the Reserve where no wharf exists.

In Tariff 34–B it was provided:

"Item No. 5.—Application: The rates named herein apply on all freight moving by water handled over Docks or Wharves at Anchorage, Alaska. Wharfage charges are charges made on freight passing over docks or wharves and will be assessed against and collected from the vessel handling the freight. No facilities for handling, loading or unloading cargo, except coal in bulk, which must be done or provided for by vessel."

In the later tariff we find instead the following language:

"Item No. 5—Application: The rates named herein apply on all freight moving by water handled over The Alaska Railroad Terminal Reserve at Anchorage, Alas-

ka. Wharfage charges are charges made on freight passing over docks, wharves or natural landings on The Alaska Railroad Terminal Reserve and will be assessed against and collected from the vessel handling the freight. No facilities for handling, loading or unloading cargo, except coal in carloads."

The answer, based upon the opinions and judgments of the Circuit Court of Appeals, and supported by the former decision of this Court, may be stated as follows: (1) The government was the owner of the land in question, and as such owner had complete jurisdiction of it, so that the government could, if it desired, have built a 20-foot high fence around it, and absolutely prevented any person from having access to it; (2) the government could make whatever reasonable charges it saw fit for the use of the land or any portion thereof, or of any structure thereon, by any person; (3) the government did demand of and receive from Berger the wharfage charges as claimed until prevented by the injunction of the District Court; (4) that by reason of such injunction and for that reason only the wharfage charges on cargo moved over any part of the Reserve by Berger were not collected.

█ In answer to the suggestion that whatever the government might have done, the government did not, at the time this cause of action arose, by its formal order or regulation, set up any charges for merchandise moved from vessels over an open beach within the Reserve and, therefore, the government cannot set up such charges now, it is sufficient to say that the government did make such charges and demand payment from Berger, and did seek to collect them from Berger as a condition of using its property, whether the wharf or the adjoining tide lands of the Reserve. There is nothing in any law or in any executive order which requires the making of any formal order or regulation to set up or impose or collect wharfage or other charges on cargo moving over the lands of the Reserve. Since the United States can forbid all use of the Reserve, it has the right to demand in advance payment for such use as is permitted without making any written tariff or order or schedule, and without securing the consent or acquiescence of the Interstate Commerce Commission or even bringing the subject to the attention of the Commission.

Moreover, until the claim of the plaintiff was made in this action that only a small part of the cargo moved over the City Dock, no hint was ever given that any distinction should be made as to wharfage between merchandise moved over the City Dock and that brought ashore over adjacent ground within the Reserve. In the first suit the City Dock appeared the all important structure because it was built by the City of Anchorage. The defendant Berger, himself, in his testimony in the instant case was vague as to how much of the merchandise was put ashore over the City Dock and how much was put ashore over the open beach.

█ In the first suit, as indicated above, it is asserted that Ohlson and Cunningham demanded wharfage on cargo carried ashore "over the said City Dock and the ground adjacent thereto." That this was no chance or meaningless allegation is made certain by reference of the affidavit of R. J. Bunn, one of counsel for Berger, filed in support of the application for an order to show cause wherein he says: "The Alaska Railroad claims wharfage for the cargo coming over the *City Dock and the ground along side*," and in the order to show cause why the injunction should not issue in which we find that Ohlson and Cunningham are ordered to appear before the Court and show cause why they should not be "enjoined * * * from interfering with the removal of cargo from said *City Dock, and from the ground adjacent thereto*." (Emphasis supplied.) The "ground adjacent" to the City Dock was just as much covered by the injunction as the City Dock itself, and the conclusion is inescapable that such was the intention of the Court. The use of the word "and" between the words "City Dock" and "the ground adjacent thereto" or the "ground along side" is necessary in such pleading, just as in the case of criminal statutes where the several ways in which

the criminal act may be committed, connected by the word "or," are denounced in the same sentence, an indictment may combine them by use of the word "and," and proof of any one is sufficient to convict. The use of the disjunctive in any such pleading would render it vulnerable.

Berger further attempted to make the distinction that certain structures adjoining the City Dock and attached thereto were not a part of the City Dock but were rather cribs which he, himself, had put in on the land and to which, therefore, he should have had free access. This contention cannot be sustained because it is clear beyond dispute that the cribbing mentioned by the defendant is a part of the City Dock and nothing else.

If the government ownership of the Reserve is to be effective, and if the right to exclusive possession of such land is to be more than an empty phrase, and if the language used by the Circuit Court of Appeals in the first suit that the government "had a right to forbid any use of the City Dock" by Berger means anything at all, then the government had the right to forbid the use of the land in the Reserve to Berger for bringing cargo ashore, and to make reasonable charges for any cargo which Berger might wish to bring ashore over the government's property, whether City Dock or open beach within the Reserve.

It is always to be remembered that the plaintiffs' complaint in this action claims wharfage, or the equivalent thereof, from the defendant Berger, and through him from the sureties on his injunction bond, for the cargo brought ashore over the city wharf "and the lands adjacent thereto." Thus is indicated the claim of the government for wharfage, not only over the City Dock, as that structure would be circumscribed by the defendant Berger, but also such cargo as was brought ashore over the adjacent lands.

Reference is made in the plaintiffs' complaint in this action in Paragraphs XIII and XX to the rates for wharfage "published by the Interstate Commerce Commission." While there was proof that the Interstate Commerce Commission did "publish" the rates prescribed in Tariff 34-B by placing the same on file in the office of the Interstate Commerce Commission, and perhaps by furnishing copies to those who might request such copies, no testimony was received or even offered to indicate that such "publication" was of the slightest legal or other value. The law authorized the President to build and operate a railroad and to do whatever might be necessary in connection therewith, and there was no suggestion in the law or in any executive order brought to the attention of the Court which indicates that wharfage or other rates, to insure their validity, must be "published by the Interstate Commerce Commission" and, therefore, the words "published by the Interstate Commerce Commission" may be treated as surplusage.

■ The question for immediate determination is whether the Court erred in instructing the jury to bring in a verdict for the plaintiffs in the action, or whether there was a disputed issue of fact which should have been submitted to the jury. I think there was no real disputed issue of fact to submit to the jury because under any aspect of the case, when viewed in the light of the former decisions of the Circuit Court of Appeals and of this Court, Berger was bound to pay the charges for the use of the government's property which had been demanded by the government before the cargo came ashore, and to avoid the payment of which the injunction was asked for and granted.